**ALYESKA PIPELINE SERVICE COMPANY et al.**

v.

**The UNITED STATES.**

**No. 384–78.**

United States Court of Claims.

June 18, 1980.

Davis, J., concurred in part and filed opinion.

Quinn O'Connell, Washington, D. C., atty. of record for plaintiff. Ernest C. Baynard III and Connole & O'Connell, Washington, D. C., of counsel.

Steven A. Herman, Washington, D. C., with whom was Asst. Atty. Gen. James W. Moorman, Washington, D. C., for defendant. Paul Smyth, Washington, D. C., Dept. of the Interior, of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS and KUNZIG, Judges.

ON PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS AND CROSS–MOTION FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

■ The plaintiffs in this case are the Alyeska Pipeline Service Company and the oil companies that formed Alyeska to act as their agent in the construction, operation, and maintenance of the trans-Alaska oil pipeline.[1] They seek a refund under one of two theories of all or part of a $12,253,730 fee paid in 1973 to the Department of the Interior reimbursing the government for its expenses incurred in processing the permit to build and operate the pipeline. The plaintiffs have moved for partial summary judgment on each of the two alternative claims before us, and the government has cross-moved for summary judgment on both claims. The government also seeks dismissal of the petition for lack of jurisdiction. We hold that we have jurisdiction and that the Secretary of the Interior lacked authority under applicable statutes and regulations to assess any part of this fee, and we grant the plaintiffs' motion for summary judgment on their first claim.[2]

I.

In 1969, the plaintiffs applied to the Secretary of the Interior, pursuant to section 28 of the Mineral Leasing Act of 1920, 30 U.S.C. § 185 (1970) (amended 1973), for a right of way for a pipeline to transport crude oil across Alaska from recently discovered oil fields on the North Slope. The granting of the right of way was delayed for several years because of litigation in opposition to the pipeline undertaken by a coalition of environmental groups. Initially, a district court blocked the right of way pending the preparation of an environmental impact statement pursuant to the National Environmental Policy Act of 1969, 42

---

1. The eight companies that are currently members of Alyeska are: Amerada Hess Pipeline Corporation, Arco Pipe Line Company, BP Pipelines Inc., Exxon Pipeline Company, Mobil Alaska Pipeline Company, Phillips Alaska Pipeline Company, Sohio Pipe Line Company, and Union Alaska Pipeline Company. Alyeska was originally known as the Trans-Alaska Pipeline System; after the name of the oil company consortium was changed to Alyeska, the pipeline project itself continued to be called the Trans-Alaska Pipeline System, or TAPS.

2. The sums sought in the second claim are totally subsumed within the first claim. (The second claim alleges that part of the fee challenged in the first claim as not authorized by statute or regulation also was assessed unconstitutionally.) Our decision therefore gives the plaintiffs all the money they seek in this portion of the suit, and we have no need to reach the second claim. The third claim, relating to fees assessed after the permit was granted, is not covered by any of the summary judgment motions and is not before us on the merits, although it is generally within the scope of the government's attack on our jurisdiction.

U.S.C. § 4332 (1976). After such a statement was prepared, however, the court of appeals enjoined the issuance of the right-of-way permit because the proposed right of way would have violated width restrictions in section 28 of the Mineral Leasing Act. *Wilderness Society v. Morton*, 479 F.2d 842 (D.C.Cir.), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973).

Shortly thereafter, Congress amended section 28 to remove the width restriction and reform generally the law pertaining to pipeline rights of way. Pub.L.No.93–153, tit. I, 87 Stat. 576 (1973), *codified in* 30 U.S.C. § 185 (1976). In addition, Congress provided for the expedition of the trans-Alaska pipeline project by declaring that the environmental impact statement was satisfactory and limiting further judicial review of the Secretary's actions with respect to the plaintiffs' right of way. Trans-Alaska Pipeline Authorization Act, Pub.L.No. 93–153, tit. II, 87 Stat. 584 (1973), *codified in* 43 U.S.C. §§ 1651–1655 (1976). With the legal barriers to the construction of the pipeline thus removed, on January 23, 1974, the Secretary and the plaintiffs entered into an "Agreement and Grant of Right-of-Way for Trans-Alaska Pipeline." The pipeline has been completed, and oil is now flowing through it.

The Secretary of the Interior first sought reimbursement from the plaintiffs of the Department's costs in processing the plaintiffs' application in an invoice dated August 15, 1972, for $9,088,500, covering "costs (or expenses) incurred from funds reprogrammed or appropriated for pre-permit investigative work pertaining to the proposed Trans-Alaska Pipeline System" through the end of fiscal year 1972. The plaintiffs did not pay any of this amount at this time.

After the amendment of the Mineral Leasing Act and pursuant to its provisions, the Secretary sent Alyeska another invoice on November 20, 1973, seeking reimbursement of all costs incurred through September 30, 1973, which totalled $12,253,730. Approximately 75 percent of this amount represented the cost of the environmental impact statement. The government admit-

ted in its answer to the plaintiffs' amended petition that the Department would not have issued the right of way to the plaintiffs if they had not paid the $12 million. The plaintiffs paid this amount, and the right-of-way agreement acknowledged the payment. The plaintiffs subsequently sought a refund of part of this amount and other fees from the Secretary, and, after his denial of their claim, filed this suit.

## II.

The government has moved to dismiss the petition on the ground that we have no jurisdiction to entertain it. It contends that section 203(d) of the Trans-Alaska Pipeline Authorization Act, 43 U.S.C. § 1652(d), vests "exclusive jurisdiction over disputes such as the instant one in the United States District Courts." Section 203(d) provides that

the actions of the Federal officers concerning the issuance of the necessary rights-of-ways, permits, leases, and other authorizations for construction and initial operation at full capacity of [the] pipeline system shall not be subject to judicial review under any law except that claims alleging the invalidity of this section may be brought within sixty days following November 16, 1973, and claims alleging that an action will deny rights under the Constitution of the United States, or that the action is beyond the scope of authority conferred by this chapter, may be brought within sixty days following the date of such action. A claim shall be barred unless a complaint is filed within the time specified. Any such complaint shall be filed in a United States district court, and such court shall have exclusive jurisdiction to determine such proceeding in accordance with the procedures hereinafter provided [precedence on docket and direct review by Supreme Court], and no other court of the United States, of any State, territory, or possession of the United States, or the District of Columbia, shall have jurisdiction of any such claim whether in a proceeding instituted prior to or on or after November 16, 1973.

The government asserts that the $12 million fee challenged here was "one of the conditions of issuance of the permit for the right of way" and thus "fall[s] squarely within the purview of this provision" as an action of a federal officer "concerning the issuance of the necessary rights-of-way."

 We disagree. The assessment of the fee covering the government's cost of processing the permit cannot properly be viewed as a federal action "concerning the issuance of the necessary rights-of-way, permits . . . for construction and initial operation . . . of [the] pipeline system." As the legislative history discussed below indicates, the intent of section 203(d) was to limit litigation that would further delay construction of the pipeline. There is no reason why Congress would have wanted to preclude us from entertaining this suit, which could not have that effect of delaying construction.

When the Trans-Alaska Pipeline Authorization Act was enacted, the nation was in the midst of the energy crisis brought on by the Arab oil embargo, and Congress sought to gain access to Alaskan oil as rapidly as possible. As Senator Jackson, the Senate manager of the pipeline bill, explained (119 Cong.Rec. 36808 (1973)):

> The current energy shortage points up the critical need to begin construction of the pipeline as soon as possible so that the vast oil resources on the North Slope of Alaska will be available to help meet our urgent energy needs and reduce our growing dependence on uncertain, insecure, and politically motivated foreign sources of crude oil.

The restrictions in section 203(d) further the general purpose expressed in section 203(a), 43 U.S.C. § 1652(a) (1976), to

> insure that . . . the trans-Alaska oil pipeline be constructed promptly without further administrative or judicial delay or impediment. To accomplish this

purpose it is the intent of Congress to exercise its constitutional powers to the fullest extent in the authorizations and directions made herein and in limiting judicial review of the actions taken pursuant thereto.

*See* H.R.Rep.No.624, 93d Cong., 1st Sess. 28, *reprinted in* [1973] U.S.Code Cong. & Ad. News, pp. 2523, 2530.[3]

Accomplishment of this objective would not be thwarted by our entertaining this suit. The pipeline has been completed and is operational. Indeed, it is the government's interpretation of section 203(d) that would threaten the congressional objective of avoiding further delay in the construction of the pipeline through litigation. If the plaintiffs had filed this suit in the district court within 60 days of receipt of the invoice, as the government's argument would require, the very pendency of that suit might have postponed issuance of the permit and the start of construction.

### III.

The general rule applicable to all agencies, as provided in the Independent Offices Appropriation Act, 31 U.S.C. § 483a (1976), is that the government may obtain reimbursement of its expenses in issuing licenses or permits only pursuant to authorizing regulations:

> It is the sense of Congress that any . . . license, permit, . . . or similar thing of value or utility . . . provided, granted, . . . or issued by any Federal agency . . . to or for any person . . . shall be self-sustaining to the full extent possible, and the head of each Federal agency is *authorized by regulation* . . . to prescribe therefor such fee, charge, or price . . . as he shall determine . . . to be fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts . . . . [Emphasis added.]

---

**3.** "It is . . . in our national interest that the Alaska pipeline be built as soon as possible . . . ."; "I do not believe it is in our interest to delay the Trans-Alaskan pipeline any longer than required by the Court of Appeals decision . . . ." Letter from Secretary of the Interior Morton to all U. S. Senators (Apr. 4, 1973), *reprinted in* [1973] U.S.Code Cong. & Admin. News, pp. 2508, 2508, 2511–12.

■ The pipeline right of way the plaintiffs received was a "license, permit . . or similar thing of value or utility." The statute therefore would have authorized the Secretary to impose a fair and equitable "fee, charge or price" "therefor" if he had "authorized [such assessment] by regulation." During the period the government incurred the expenses involved in this litigation, however, the Secretary had not so authorized the fees here in dispute.[4] Until April 23, 1975, the only fee for a right-of-way permit authorized by regulation was a $10 application service fee. 43 C.F.R. § 2802.1–2 (1974).[5] Thus, the Secretary's imposition of the fees here involved was not in accordance with or authorized by the Independent Offices Appropriation Act, and under that act was invalid.

The Independent Offices Appropriation Act was enacted in 1951 (ch. 376, 65 Stat. 290). Long before 1970, the Secretary could have promulgated regulations requiring applicants for licenses and permits to reimburse the United States for all of the expenses it incurs in processing their applications, including the cost of an environmental impact statement. Instead, the only regulation the Secretary adopted provided for a minimal filing fee. It was not until 1975, after the expenses involved in this case had been incurred, that the Secretary first promulgated the current comprehensive regulation that provides for reimbursement of all expenses, including the cost of the environmental impact statement. 40 Fed.Reg. 17842 (1975).[6]

IV.

The government contends, however, that the governing statute is not the Independent Offices Appropriation Act but the following provision of the 1973 amendment to the Mineral Leasing Act (30 U.S.C. § 185*l* (1976)):

The applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application, and the holder

4. During the same period, the Public Land Administration Act, 43 U.S.C. § 1371 (1970) (repealed 1976), was in force. That statute perhaps would have authorized the Secretary to impose these fees. *But see Public Serv. Co. v. Andrus*, 433 F.Supp. 144, 149–50 (D.Colo.1977). Like the Independent Offices Appropriation Act, however, the Public Land Administration Act required the Secretary to promulgate what in effect were regulations pursuant to which the fees would be assessed. We find it unnecessary to decide these questions, however, since (1) neither side relies upon the Public Land Administration Act, and (2) we conclude that the Independent Offices Appropriation Act covers these fees.

5. The current regulation probably would permit the assessment of all of the fees at issue here, but does not apply to pre-promulgation costs. 43 C.F.R. § 2802.1–2 (1979).

6. The government notes that the plaintiffs first made the claim that the Secretary was required to act pursuant to regulation in their amended petition filed with us on February 16, 1979, and did not raise the issue before the Secretary. The administrative proceedings before the Secretary, however, were held pursuant to section 26 of the right-of-way agreement. That section provides for appeals by permittees to the Secretary from orders temporarily suspending construction or denying resumption of suspended activities, and from certain other orders the permittees deem critical.

One of the contentions the plaintiffs made before the Secretary was that a portion of the $12 million fee was improper because it reflected administrative costs of the Bureau of Land Management. In the section of his decision dealing with "Costs Incurred to September 30, 1973" (the fees here involved), the Secretary rejected this claim without reaching its merits, on the ground that "the owner companies agreed to pay $12,253,730 as a sum certain for costs incurred up to that time by the United States. This amount is a contractual obligation of the owner companies, and is not subject to review on appeal to the Secretary of the Interior under Section 26 of the Agreement."

The Secretary thus concluded that he had no authority under the appeal provisions of section 26 of the contract—the sole basis upon which plaintiffs sought review—to consider the validity of the fees assessed for costs incurred prior to October 1, 1973. The government does not argue that the plaintiffs' failure to raise this issue before the Secretary bars them from raising it before us and bars us from considering it. The Secretary's ruling described above establishes that if the plaintiffs had raised the regulation issue before him, he would not have considered it. Considering all the circumstances, we conclude that the plaintiffs' failure to make the contention before the Secretary does not preclude them from raising it here.

of a right-of-way or permit shall reimburse the United States for the costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities on such right-of-way or permit area and shall pay annually in advance the fair market rental value of the right-of-way or permit, as determined by the Secretary or agency head.

The government argues that this provision is the one "upon which defendant based its action, applies specifically to oil and gas rights of way, [and] does not require the Secretary to promulgate regulations." According to the government, the Independent Offices Appropriation Act is not "concerned with oil and gas pipeline rights of way" and is not "relied upon by the United States to defend the challenged charges."

The government's argument has two fatal flaws. (A) The reimbursement requirement in section 185(*l*) does not override the requirement in the Independent Offices Appropriation Act that the reimbursable fees for licenses and permits be "authorized by regulation." (B) In any event, section 185(*l*) does not apply retroactively to require the reimbursement of the expenses the United States incurred in processing the trans-Alaska pipeline permit before the effective date of that section.

A.1. Although the Independent Offices Appropriation Act does not explicitly refer to oil and gas pipeline rights of way, it nevertheless applies to fees for such rights of way. The act covers "any . . . permit . . . granted . . . by any Federal agency." Nothing in that act or in any subsequent legislation indicates that this broad language does not include pipeline rights of way. In fact, the initial invoice the Secretary sent to Alyeska, which he did before the enactment of the Mineral Leasing Act amendments (and which invoice Alyeska did not pay), was grounded on the Independent Offices Appropriation Act. As the Secretary stated: "The original legal basis for charging Alyeska for costs incurred by the United States in processing Alyeska's application for a trans-

Alaska oil pipeline was . . . 31 U.S.C. § 483a (1970) . . . ." *Alyeska Pipeline Service Co.*, S.N. P001–APO–2084 (Interior Dep't July 29, 1977).

2. Section 185(*l*) does not override the requirement of the Independent Offices Appropriation Act that reimbursement of expenses be "authorized by regulation." Section 185(*l*) merely obligates an applicant for a right of way or permit to reimburse the United States for its expenses of processing the application (and also obligates the holder of a right of way or permit to reimburse the government for further expenses the latter may incur). The provision does not specify the procedures by which the United States is to determine the reimbursable expenses. Nor does it indicate that in enacting section 185(*l*) Congress intended to eliminate for right-of-way and permit applications generally, or for the trans-Alaska pipeline in particular, the regulation requirement in the Independent Offices Appropriation Act.

The legislative history of section 185(*l*) confirms that Congress contemplated and understood that the fees authorized by section 185(*l*) would be assessed pursuant to regulation.

Both the House and Senate bills had expense-reimbursement provisions. The Senate considered the bill first. Its reimbursement provision would have allowed recovery of costs pursuant to regulation or without regulation as a condition of the granting of a right of way (S. 1081, 93d Cong., 1st Sess. § 104(f), S.Rep.No.207, 93d Cong., 1st Sess. 6 (1973)):

No right of way shall be issued for less than the fair market value thereof as determined by the Secretary or agency head. The Secretary or agency head may, by regulation or prior to promulgation of such regulations, as a condition of a right-of-way, require an applicant or holder of right-of-way to reimburse the United States for all reasonable administrative and other costs incurred in processing an application and in inspection and monitoring of construction, operation, and termination of the facility . . . .

By allowing reimbursement without regulation, the Senate provision expanded the previous authority granted in section 483a of the Independent Offices Appropriation Act.[7] In its Report, however, the Senate Committee on Interior and Insular Affairs made it clear that this section was nonetheless drafted in light of section 483a (S.Rep. No.207, 93d Cong., 1st Sess. 44 (1973), *reprinted in* [1973] U.S.Code Cong. & Admin. News, pp. 2417, 2450):

> In addition to the authority granted by this subsection, authority to obtain reimbursement for things of value performed, furnished or granted by a Federal agency is granted in 31 U.S.C. § 483a. That Act establishes a policy that agencies promulgate regulations establishing fees and charges which make their activities as self-sustaining as possible in providing services to particular members of the public. In establishing regulations or in conditioning right-of-way grants the Secretary or agency head is to follow a standard of reimbursement which is fair and equitable, and as uniform as practicable, taking into consideration the direct and indirect cost to the government, the value to the recipient, the public policy or public interest served, and other pertinent facts.
>
> Prior to promulgating regulations establishing uniform schedules for reimbursement, the Secretary is expressly authorized to require reimbursement as a condition of a right-of-way, taking into consideration the same factors which are intended to guide the Secretary in promulgating regulations.

The language used in the Report to define the standards for the regulations and cost reimbursement is drawn virtually verbatim from the earlier act, which reads "fair and equitable taking into consideration direct and indirect cost to the Government, value to the recipient, public policy or interest served, and other pertinent facts." Thus, the Senate Committee was not proposing to create a completely new scheme of administrative cost reimbursement, but instead was merely expanding the previous scheme somewhat by permitting reimbursement without regulation in certain circumstances.

The cost-reimbursement provision in the House bill, on the other hand, did not provide any procedures for assessing reimbursement fees, although it was otherwise similar to the Senate version (H.R. 9130, 93d Cong., 1st Sess. sec. 1, § 28(f), H.R.Rep. No.414, 93d Cong., 1st Sess. 2 (1973)):

> [T]he applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application, and the grantee of a right-of-way or permit or the user thereof shall reimburse the United States for the costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities on such right-of-way or permit area and shall pay annually in advance the fair market value of the right-of-way or permit, as determined by the Secretary.

The House Report did not further explain this language as it pertained to cost reimbursement. It merely stated that section 28(f) "requires the applicant for a right-of-way or permit to pay the cost of processing the application. . . . In addition, the grantee must reimburse the United States

---

7. This expansion was at least in part at the behest of the Department of the Interior, which in response to a Senate Committee questionnaire expressed a desire for a provision similar to this one. Acting Secretary Whitaker stated that the Department believed that it had the authority to recover costs under existing law and was drafting regulations to accomplish that result, but he also believed that a new statutory provision "would have the advantage of forestalling litigation as to whether we have the authority under existing law to issue the reimbursement regulations we are contemplat-ing and to make reimbursement a condition of permits we issue." He noted that even without regulations the Department intended to require Alyeska to reimburse the government for expenses already incurred, but did not offer any justification or authority for this departure from the normal departmental policy, under which "we do not recover all our administrative costs from a right-of-way applicant." Letter from Acting Secretary of the Interior Whitaker to Senator Jackson (Apr. 9, 1973), *reprinted in* [1973] U.S.Code Cong. & Admin. News, pp. 2475, 2477–78.

for the costs incurred in monitoring compliance with the terms and conditions imposed." H.R.Rep.No.414, 93d Cong., 1st Sess. 13 (1973).

The Conference Committee bill, which was enacted, contained essentially the House's version of the reimbursement provision, with only inconsequential wording changes. The Conference Committee thus eliminated the provision in the Senate bill authorizing the Secretary to require reimbursement without regulations if done as a condition to a right of way.

The Conference Committee Report did not refer to the need for regulations, stating only that section 185(*l*) "requires reimbursement of cost incurred in processing an application [, which] costs include the cost of preparing an environmental impact statement." H.R.Rep.No.624, 93d Cong., 1st Sess. 25, *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2523, 2527. During the debate on the Conference Committee bill, however, Senator Jackson, the Senate manager and chairman of the Senate conferees, was asked whether the costs to be reimbursed were "only those direct and identifiable costs of processing applications and monitoring pipeline construction and operation which are reasonable and necessary for those purposes." 119 Cong.Rec. 36814 (1973). Senator Jackson responded affirmatively, and went on to note that (*id.*)

> [t]he conferees contemplate that the Secretary will promulgate regulations establishing a schedule for reimbursement according to standards which are fair and equitable and as uniform as practicable, taking into consideration the direct and indirect cost to the Government, the value to the recipient, the public policy in public interest served and other pertinent facts.

Not only did Senator Jackson explicitly state that the conferees understood the bill to require regulations, but he also repeated the Senate Report's use of the language of the Independent Offices Appropriation Act. This time, however, this language was used in the context of a requirement that such reimbursement only be by regulation, which was precisely what that earlier act required.

In sum, there is no indication that Congress intended the Secretary's authority under section 185(*l*) to obtain reimbursement of expenses to be exercised except pursuant to regulation. This conclusion is confirmed by the Secretary's promulgation in 1975 of detailed regulations governing such reimbursement. 40 Fed.Reg. 17842 (1975), *codified in* 43 C.F.R. § 2802.1–2 (1979).

■ B. Even if section 185(*l*) were construed to permit the Secretary to require reimbursement without first promulgating regulations, the section still could not properly be applied retroactively to cover costs the government incurred before the statute was enacted. The Mineral Leasing Act amendments became effective in November 1973, while the expenses here involved all had been incurred by September 30, 1973.

■ "[T]he first rule of construction [is] that legislation must be considered as addressed to the future, not to the past." *Union Pacific Railroad Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). *See also Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964). This rule governs unless the words in the statute "are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied." *United States v. Heth*, 7 U.S. (3 Cranch) 399, 413, 2 L.Ed. 479 (1806), *cited in Union Pacific, supra*, 231 U.S. at 199, 34 S.Ct. at 102. *See also Heth, supra*, 7 U.S. at 414, 2 L.Ed. 479 (Cushing, J., concurring) ("it [is] unreasonable, in my opinion, to give the law a construction, which would have such a retrospective effect, unless it contained express words to that purpose"). This court has stated the "governing rule" to be that "Congress is presumed to have intended statutes or amendments to operate prospectively unless there is clear expression or legislative history to the contrary." *Sea-Land Service, Inc. v. United States*, 204 Ct.Cl. 57, 78, 493 F.2d 1357, 1369, *cert. denied*, 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974).

The Mineral Leasing Act amendments contain no clear statement that section 185(*l*) operates retroactively, and giving the section only prospective application would not render it superfluous or seriously weaken its importance or effectiveness. Moreover, the legislative history of the provision does not establish that Congress intended it to be retroactive, but on the contrary is inconsistent with that conclusion. This case, therefore, does not warrant an exception to the general presumption against retroactive statutory application.

■ 1.(a) Section 185(*l*) is silent on whether it applies retroactively. It states only that an applicant for a right of way or permit "shall reimburse the United States for administrative and other costs incurred in processing the application" and that the holder of a right of way or permit shall reimburse the United States for monitoring costs. There is not even a suggestion that reimbursement is to be made for costs incurred prior to the enactment of the provision.

(b) Section 185(*l*) is a provision of general applicability that applies to all applicants for and holders of rights of way and permits under the Mineral Leasing Act, not just to the plaintiffs. The 1973 Act contains two principal parts. Title I of the act contains a general revision of the statutory system dealing with rights of way across federal lands and is codified in Title 30 of the United States Code. Title II deals only with the trans-Alaska pipeline and is codified in Title 43 of the Code. *See* 119 Cong. Rec. 27633 (1973) (Representative Meeds). Section 185(*l*) is part of Title I.

Section 203(c), which is in Title II, specifically incorporates in that title most of Title I, including section 185(*l*). The effect of this incorporation of section 185(*l*) is merely to make explicit that the latter section applies to the trans-Alaska pipeline. Making section 185(*l*) thus applicable, however, does not require that it be given retroactive effect in order to have any meaning. It has a significant prospective effect upon the plaintiffs: it makes them liable for the additional costs the United States incurred in connection with the construction and operation of the pipeline after November 1973. Indeed, plaintiffs do not dispute their obligation to reimburse the government for the latter costs. Moreover, as noted, section 185(*l*) applies not just to the plaintiffs, but generally to rights of way and permits applied for and granted under the Mineral Leasing Act.

Thus, although the impetus for the 1973 act was the desire to remove the legal barriers to the Alaska pipeline (such as those found in the National Environmental Policy Act and the Mineral Leasing Act), in Title I of the act Congress went much further than merely enacting an Alaskan pipeline act. It also revised the law governing rights of way generally. The cost-reimbursement provision applies prospectively to all rights of way including those already granted and still operational (and also including the Alaska project). *Cf.* 119 Cong.Rec. 36607 (1973) (Representative Udall). The command of cases such as *Heth, supra,* that statutes are given retroactive effect only if "no other meaning can be annexed to them" is not satisfied.

2. The legislative history of the Mineral Leasing Act amendments does not indicate that Congress intended section 185(*l*) to be applied retroactively to Alyeska to require it to reimburse the United States for expenses incurred prior to the legislation. To the contrary, the history points in the opposite direction.

As discussed in part IV.A, *supra*, the bill was first debated in the Senate. Several Senators indicated that they believed that the government would not be reimbursed for the costs it already had incurred in connection with the pipeline. Senator Fannin, for example, stated twice that the Mondale amendment (which sought to delay authorization of the pipeline pending further study and which the Senate rejected) "[w]ould cost U.S. taxpayers more money for 1 year's study. U.S. Government costs to date of trans-Alaska study and related expenses exceed $7 million." 119 Cong.Rec. 23344, 23610 (1973). Similarly, Senator Stevens stated that "[m]y friend from Nevada

[Senator Bible] and I and the Appropriations Committee have asked, time and time again, have asked, 'How much will this cost + ' This analysis has cost approximately $12 million of taxpayers dollars to study the environmental aspects of this pipeline." *Id.* at 24304.

At another point in the debate, Senator Stevens remarked that "we have spent $12 million to meet NEPA requirements." *Id.* at 23750. *See also id.* at 23574, 23577. His colleague from Alaska, Senator Gravel, distinguished between the 2 years and $9 million spent by the Interior Department and the "additional $350 million . . . spent on engineering and environmental studies by the Alyeska Pipeline Service." *Id.* 22820.

All of these statements were made in discussing a bill that had a provision for reimbursement of expenses incurred in connection with processing right-of-way and permit applications (*see* page 1011, *supra*). If the Senate had understood that provision to require the plaintiffs to reimburse the government for the substantial amount it already had expended in processing the pipeline application, it is difficult to believe that somebody would not so have stated. The absence of any indication from any Senator that the reimbursement provision was to have retroactive effect is strong evidence that the Senate did not intend it to have that effect.

Shortly after the Senate passed the bill, the House passed its version. The House bill also had a provision for reimbursement of expenses (*see* pages 1012–1013, *supra*). Again, there were frequent references to the substantial amount the government had spent in preparing the environmental impact statement. Once again, no one suggested that the plaintiffs would be responsible for those expenditures. Representative examples of such statements include:

"The Secretary [of the Interior] prepared a comprehensive and detailed environmental impact statement at a cost in excess of $7,000,000." *Id.* at 27629 (Representative Melcher, House manager of the pipeline bill).

"The final environmental impact statement which was released in March 1972, required 175 man-years of study by the Department of the Interior and other agencies at a cost in excess of $9 million." *Id.* at 27638 (Representative Martin).

"They seem to ignore the monumental environmental study of the Federal interdepartmental task force, a thoroughly professional and comprehensive work conducted at an expenditure of 175 man-years of effort at a cost in excess of $9 million." *Id.* at 27645 (Representative Broyhill).

The Conference Committee reported out the bill that was enacted. The Conference Report said nothing even suggesting that the expense-reimbursement provision would require Alyeska to pay for expenses previously incurred. All it stated about this provision was as follows (H.R.Rep.No.624, 93d Cong., 1st Sess. 25, *reprinted in* [1973] U.S. Code Cong. & Admin. News, pp. 2523, 2527):

Section 28(*l*) requires reimbursement of costs incurred in processing an application. These costs include the cost of preparing an environmental impact statement. It also requires payment annually in advance of the fair market rental value of the right-of-way or permit. This value can be based on any combination of factors that might reasonably be considered by a landowner in a free market, when determining the price to be asked for the right to use or cross his land.

The fact that the Congress intended this general reimbursement provision, which would govern all right-of-way and permit applications and monitoring under the Mineral Leasing Act, to cover the cost of preparing an environmental impact statement does not indicate that Congress intended to require Alyeska to reimburse the United States for the amounts it previously had expended in preparing the environmental impact statement for that particular project.[8]

---

8. We do not, however, pass on the question whether the United States is constitutionally

precluded, under the doctrine announced in *Federal Power Comm'n v. New England Power*

The only reference to the dollar cost of the environmental impact statement in the debates on the Conference Committee bill was Representative Hogan's repetition of Representative Martin's earlier statement quoted at page 1015, *supra*. 119 Cong.Rec. 36614 (1973).

The only item in the entire legislative history that provides any support for the government's position—and the only item which it cites—is the following statement in the debate on the conference report by Senator Jackson, the Senate manager of the bill: "In the case of the trans-Alaska pipeline permit it is anticipated that the Government will be reimbursed for all money that has been, or will be appropriated and spent as a line item under this subject." 119 Cong.Rec. 36814 (1973). This statement immediately followed Senator Jackson's statement, quoted at page 1013, *supra*, that fees assessed under section 185(*l*) would be pursuant to regulations.

This single statement falls far short of establishing that Congress intended to make Alyeska liable for the more than $12 million the United States already had expended in connection with the pipeline. Although the government tells us that these costs were "line item[s] under this subject," it is far from clear that the other members of the Senate so understood that statement or believed that in voting for the bill they were requiring Alyeska to pay for those costs.

The House had passed the bill the day before Senator Jackson made his statement. That chamber cannot be deemed to have anticipated and acquiesced in Senator Jackson's views.

The short of the matter is that, in view of the repeated references in the earlier debates to the millions of dollars the government has spent on the environmental impact statement and other aspects of proc-essing the trans-Alaska pipeline right-of-way application, it is difficult to believe that if Congress had intended to make Alyeska liable for those expenses, it would not have said so explicitly and clearly—either in the Conference Committee Report or in the debates on the floor. The single cryptic statement of Senator Jackson is not enough to establish that Congress intended the general reimbursement provision of the Mineral Leasing Act (section 185(*l*)) to be applied retroactively to the plaintiffs to require them to reimburse the United States for more than $12 million.[9] Viewed in its entirety, the legislative history requires a contrary conclusion.

## V.

Alternatively, the government contends that, regardless of the Secretary's compliance with the statutes authorizing fee assessments, the plaintiffs bound themselves contractually in the right-of-way agreement to make these payments, and that basic principles of contract law preclude a refund.

In the agreement, the plaintiffs undertook to reimburse the Department of the Interior for the costs it incurred in connection with the pipeline, and they paid without dispute more than $23 million billed from the second quarter of fiscal year 1974 through the transition quarter of fiscal year 1976. (They objected to more than $3 million also billed during this period, more than $2 million of which remains in dispute.) Among the costs specifically to be reimbursed under the agreement were the $12 million here at issue:

A. Permittees [plaintiffs] shall reimburse the United States for all reasonable administrative and other costs heretofore or hereafter incurred directly or indirectly by the Department for . . . proc-

---

*Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974), and *National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), from requiring reimbursement of environmental impact statement preparation costs.

**9.** The government has not presented any evidence that this provision was applied retroactively to any other right-of-way or permit applicant or holder.

essing applications filed by Permittees in connection with the Pipeline System . . . . .

B. Subject to collection, receipt is hereby acknowledged by the Department of the sum of . . . $12,253,730 which has been paid to the United States by Permittees at the time of execution of this Agreement. Said sum represents the amount of the costs referred to in subsection A of this Section, which were incurred by the Department through September 30, 1973.

The government argues that this provision made the $12 million fee part of the consideration for the right-of-way permit. Under its view, "[p]laintiffs are essentially asking this Court to sanction a breach of the contract which they voluntarily and knowingly entered into." [10]

We have held in the preceding section that the Secretary was not authorized to assess these costs against the plaintiffs. The question therefore is not whether the plaintiffs agreed to pay this fee, but whether their agreement to do so overrides the statutory bar to its assessment.

The government relies upon *United States v. Edmondston*, 181 U.S. 500, 21 S.Ct. 718, 45 L.Ed. 971 (1901). The plaintiff in that case had paid the United States $2.50 an acre for land with a statutory selling price of $1.25 an acre, apparently on the mistaken assumption of both parties that the higher price was correct. We awarded the purchaser the amount of the overpayment, but the Supreme Court reversed, holding that the plaintiff had not stated a claim within our jurisdiction. The Court ruled that "the transaction was purely voluntary on [the plaintiff's] part, and that while there was a mistake it was mutual and one of law—a mistake on his part not induced by any attempt to deceive or misrepresentation by the government offi-

cials." *Id.* at 515, 21 S.Ct. at 724. (In cases such as *Rough Diamond Co. v. United States*, 173 Ct.Cl. 15, 351 F.2d 636 (1965), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966), we have followed *Edmondston* and barred recovery of overpayments to the government.)

In a line of cases originally arising out of sales of surplus ships by the government after World War II, however, this court has found the *Edmondston* doctrine inapplicable. *See Finn v. United States*, 192 Ct.Cl. 814, 428 F.2d 828 (1970); *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 426 F.2d 314 (1970); *Seatrade Corp. v. United States*, 152 Ct.Cl. 356, 285 F.2d 448 (1961); *Suwannee Steamship Co. v. United States*, 150 Ct.Cl. 331, 279 F.2d 874 (1960); *Sprague Steamship Co. v. United States*, 145 Ct.Cl. 642, 172 F.Supp. 674 (1959); *Nautilus Shipping Corp. v. United States*, 141 Ct.Cl. 391, 158 F.Supp. 353 (1958); *Clapp v. United States*, 127 Ct.Cl. 505, 117 F.Supp. 576, *cert. denied*, 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954); *Southeastern Oil Florida, Inc. v. United States*, 127 Ct.Cl. 409, 119 F.Supp. 731 (1953), *cert. denied*, 348 U.S. 834, 75 S.Ct. 56, 99 L.Ed. 658 (1954); *A. H. Bull Steamship Co. v. United States*, 123 Ct.Cl. 520, 108 F.Supp. 95 (1952). *Cf. Board of Directors & Officers, Forbes Federal Credit Union v. National Credit Union Administration*, 477 F.2d 777 (10th Cir.), *cert. denied*, 414 U.S. 924, 94 S.Ct. 233, 38 L.Ed.2d 158 (1973); *Standard Airlines, Inc. v. Civil Aeronautics Board*, 177 F.2d 18 (D.C.Cir.1949); *Peoples Bank v. Eccles*, 161 F.2d 636 (D.C. Cir.1947), *rev'd on other grounds*, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948) (administrative agencies cannot enter into contracts contrary to statute).

The line we have drawn is that a voluntary payment may be recovered if the statute barring the payment was enacted for the benefit of the person seeking recovery

---

**10.** The government also contends that "[i]n essence, [the plaintiffs] want this Court to rescind one part of the contract and retroactively award the right of way free of charge by relieving them of their contractual obligations." This argument is not persuasive, since, whether or not the payment should be deemed part of

the consideration for the right of way, the primary (and adequate) consideration remains the annual rental charge the plaintiffs pay for the right of way. Thus, the plaintiffs have not been awarded the right of way "free of charge."

but may not be recovered if enacted for the benefit of another. *Rough Diamond Co., supra,* 173 Ct.Cl. at 21–26, 351 F.2d at 639–42; *Chris Berg, Inc., supra.* Where the payments were exacted in violation of a statute intended to benefit the person seeking recovery, it is immaterial that that person failed to protest when making the payment. *See Finn, supra,* 192 Ct.Cl. at 820, 428 F.2d at 831.

■ In the present case we have held that section 185(*l*) permits the Secretary to require reimbursement of costs the government has incurred only if he acts pursuant to regulation and only for expenses incurred after the effective date of the statute. These limitations are designed for the benefit of the applicants for and holders of rights of way and permits and not for the benefit of the government. These two requirements—promulgation of regulations and the prospective operation of the authorization—are intended to give applicants and permittees the opportunity to be heard before the amount of reimbursement is fixed and advance notice of the expenses they will incur if their application is granted. Indeed, the statement of Senator Jackson that reimbursement would be made pursuant to regulation (page 1013, *supra*) was given in response to a question concerning the amount of reimbursable costs, and he assured the questioner that the Secretary's governing standards would be "fair and equitable."

■ Permitting the plaintiffs here to recover the amounts they paid in accordance with the contractual provisions that the Secretary had no authority to impose would not "permit [them] to reap a benefit which Congress gave no indication of wanting them to have for themselves." *Rough Diamond, supra,* 173 Ct.Cl. at 25, 351 F.2d at 642. To the contrary, it would give them the very treatment "Congress wanted *them* to" have when it enacted section 185(*l*). *Id.* (emphasis in original). Indeed, in enacting the bill Congress rejected the original Senate version that would have authorized the Secretary to require reimbursement without a regulation as a condition of a right of way—the very action the Secretary here took.

## CONCLUSION

The plaintiffs' motion for summary judgment on the first claim is granted, and the government's motions for dismissal and summary judgment are denied. The effect of this disposition is to render moot the plaintiffs' second claim. The case is referred to the Trial Division to determine the amount of recovery pursuant to Rule 131(c), and to conduct further proceedings on the third claim.

DAVIS, Judge, concurring:

I join in the result and in Parts I, II, III of the court's opinion, as well as substantially in Part V. However, I see the pertinent 1973 amendment to the Mineral Leasing Act (30 U.S.C. § 185(*l*) (1976))—discussed in Part IV of the court's opinion—through a somewhat different prism, though my end-image is virtually the same.

We all agree that the text of that amendment does not specify the procedures by which the Government is to determine the expenses for which the leasing applicant is to give reimbursement, nor does it say whether the amendment is to be applied retrospectively. On the basis of its reading of the legislative history, the court believes that, in passing the amendment, Congress intended (a) that the authorized fees were to be assessed pursuant to regulation, and (b) that the modification could not be applied retrospectively to fees already incurred by applicants (including plaintiff). To me, both the statutory words and the legislative history—considered within their own confines—leave those questions in equal balance and unanswered—and the problem must therefore be solved for this case through extrinsic general rules.

The face of the amendment is wholly neutral on both questions. There is no reference to the issuance of regulations prior to a demand for reimbursement of "administrative and other costs incurred in processing the application." Nor is there express

or implied permission to require reimbursement without regulations. Similarly, the words of the amendment, by themselves, can be read as authorizing the conditioning of the actual grant of a right-of-way on reimbursement of such expenses—so that the post-1973 grant of a permit to Alyeska would not necessarily be a retroactive application of § 85(*1*). On the other hand, there is certainly nothing in the text which explicitly applies the amendment to Alyeska.

The legislative history also seems most equivocal to me. The two branches of Congress first passed different versions; the Senate's was more explicit in allowing reimbursement without regulation but the House bill was entirely silent on the matter and therefore could be construed either way. In the debates on these separate versions, some members of both Houses referred to the costs already incurred by the Government on the Alaska pipeline without indicating that Alyeska could ultimately be responsible for those costs. The Conference Committee adopted the House version and said nothing in its report about regulations or retroactivity. Speaking on the conference proposal, Senator Jackson, a very important figure in the legislation, said that the conferees "contemplate" the promulgation of regulations, but in the very next breath stated that with respect to the Alaska pipeline permit "it is anticipated" that the Government would be reimbursed for "line item[s]" (which I take to include the costs involved in this case). 119 Cong.Rec. 36824 (1973).[1] But, as the court points out, both of those statements were made after the House had adopted the conference version which is neutral on these subjects.

The residue of the statutory text and the legislative history, for me, is that there is no objective indication that Congress as a whole addressed, and had any actual intention on, the precise question of whether Alyeska could or would be required under the new Act to reimburse the government costs now at stake. So far as I can judge, the 1973 amendment, considered by itself, neither empowered the Secretary of the Interior to impose reimbursement on Alyeska for these past expenses, nor did it preclude him from doing so. In a word, Congress left on this point a legislative gap in the 1973 modification.

That being so, I conclude that, for this plaintiff, the Independent Offices Appropriation Act, 31 U.S.C. § 483(a) (1976)—discussed in Part III of the court's opinion—continued in effect and governed the matter. Under the doctrine that implied repeals are not favored, that statute was not repealed or displaced (insofar as plaintiff is concerned) by the adoption of the 1973 amendment which left open the issue of the Government's reimbursement by Alyeska. Indeed, as the court suggests, the references at various points in the 1973 Act's legislative history to the Independent Offices Appropriation Act and its standards for reimbursement imply a favorable attitude toward the earlier statute and argue against an implied repeal. Under the Independent Offices Appropriation Act, the Secretary would have had to issue regulations in order to collect reimbursement from plaintiff (see Part III of the court's opinion). That he had not done, and accordingly there was no valid basis under that Act to demand reimbursement.[2]

---

**1.** It may be noteworthy that the Senator did not say that the proposed act called for or required regulations, but merely that the conferees "contemplated" the promulgation of regulations (possibly as if referring to an understanding with the Secretary of the Interior). Moreover, he did not say that the statute would authorize collection from plaintiff without the issuance of regulations, but merely that that eventuality was "anticipated" (again, possibly, as if referring to an understanding with the Secretary).

**2.** Like the court, I find it unnecessary to consider whether, if authorized by regulation, forced reimbursement would in this instance be constitutionally valid.

I join substantially in Part V of the court's opinion because I believe that the Independent Offices Appropriation Act had the same purpose of benefitting applicants which the court finds in the 1973 amendment to the Mineral Leasing Act.