**ALASKAN ARCTIC GAS PIPELINE COMPANY, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 236-79C.**

United States Claims Court.

March 27, 1986.

724

William W. Brackett, Washington, D.C., for plaintiffs.

George M. Beasley, III, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant.

OPINION

REGINALD W. GIBSON, Judge:

## I. *Introduction*

This case is one of a long line of cases where plaintiffs seek the refund of fees allegedly assessed illegally by the Department of the Interior (Interior) to cover the processing costs of applications for gas pipeline rights-of-way sought across federal lands.[1] The plaintiffs here, Alaskan Arctic Gas Pipeline Company (Alaskan Arctic), Northern Border Pipeline Company (Northern Border), Pacific Gas Transmission Company (PGT), Pacific Gas and Electric Company (PG & E), and Pacific Interstate Transmission Company (Pacific Interstate), each filed in 1974 applications with Interior for rights-of-way across federal lands as part of a larger transcontinental pipeline project commonly referred to as the Trans-Alaska/Canada/United States Gas Pipeline. As a result of processing those applications, plaintiffs were assessed by Interior, allegedly pursuant to valid statutory and regulatory authority,[2] "all" processing costs totalling approximately $5.2 million, including a substantial amount allocable to the preparation of an extensive environmental impact statement (EIS). Plaintiffs have paid all but $257,219.41 (plus interest) of the net fees assessed, and by this action seek a refund of the $4,053,528.42 paid.[3]

The parties have cross-moved for summary judgment. The basis of plaintiffs' claims, premised on various theories discussed *infra*, is that the regulations pursuant to which the processing costs were assessed against plaintiffs are illegal and beyond the statutory authority of Interior, in addition to being discriminatory and re-

sulted in fees which were disproportionate, excessive, and inaccurately computed. Defendant has responded and avers that it assessed the costs of processing plaintiffs' applications, including the EIS, in full conformity with its delegated authority pursuant to the Independent Offices Appropriation Act (IOAA), 31 U.S.C. § 483a (1976), the Mineral Leasing Act (MLA), 30 U.S.C. § 185(*l*)(1976), and duly conforming regulations promulgated thereunder (43 C.F.R. § 2802.1–2 (1976)). Defendant also counterclaims for the balance of the fees due, $257,219.14, plus applicable interest thereon. Jurisdiction in this court is premised on 28 U.S.C. § 1491 (1982).

After a thorough review of the parties' submissions, recent precedent binding on this court, upon oral argument of the parties, and for reasons delineated hereinafter, the court hereby (1) grants plaintiffs' motion for summary judgment to the extent plaintiffs have been charged fees relative to costs incurred *prior* to June 1, 1975; and concomitantly (2) grants defendant's motion for summary judgment with regard to the amount of those fees assessed relative to costs incurred *subsequent* to May 30, 1975. To the extent the parties cross-move for summary judgment seeking relief in addition to the foregoing dispositions, said motions are denied. Because the liability issue(s) have been bifurcated, the determination of those amounts due by each party to the other, consistent with the opinion herein, is remanded to the Department of Interior, Bureau of Land Management. The parties shall have sixty (60) days to endeavor to stipulate as to the respective amounts due. To the extent the parties

---

**1.** *See also Sohio Transportation Co. v. United States,* 5 Cl.Ct. 620 (1984), *aff'd,* 766 F.2d 499 (Fed.Cir.1985); *Alyeska Pipeline Service Co. v. United States,* Cl.Ct. No. 209–82L; *Alyeska Pipeline Service Co. v. United States,* 624 F.2d 1005, 224 Cl.Ct. 240 (1980); *Public Service Co. of Colorado v. Andrus,* 433 F.Supp. 144 (D.Colo.1977); *Nevada Power Co. v. Watt,* 711 F.2d 913 (10th Cir.1983).

**2.** Defendant cites as authority for assessing these costs: Art. IV, Sec. 3, Cl. 2, U.S. Const.; Sec. 28(*l*) of the Mineral Leasing Act, 30 U.S.C. § 185(*l*) (1976); Title V of the Independent Of-

fices Appropriations Act, 31 U.S.C. § 483a (1976); and 43 C.F.R. § 2802.1–2 (1976).

**3.** Said refund of $4,053,528.42 equals the total amount paid by the Alaskan Arctic consortium, $4,139,572.70, minus $86,044.47 paid by consortium-member Northwest Pipeline Company, which is not a party to this lawsuit. The amount plaintiffs allegedly still owe equals the gross amount unpaid, $581,167.27, minus an overcharged credit of $323,947.86 for improperly billed indirect costs.

fail to reach a stipulation, the court shall issue a further order on how the parties shall proceed.

## II. *Background Facts*

Save for the issue of damages, the parties have submitted to the court a detailed stipulation of fact which has been used as the basis of our factual findings, *infra.* Plaintiffs in this case are part of a consortium of gas pipeline companies which were organized or otherwise engaged for the purpose of providing various component pipelines to complete the trans-Alaska/Canada/United States pipeline for the delivery of natural gas to market areas in 48 contiguous states. Plaintiff Alaskan Arctic was organized to build and operate a natural gas pipeline from the Prudhoe Bay oil and gas field in northern Alaska to the border between Alaska and Canada. Plaintiff Northern Border was to build and operate a span from the border between Canada and Montana to a point in Pennsylvania. Plaintiff PGT was assigned a segment to transport natural gas from the border between Canada and Idaho to the border between California and Oregon. PGT was to then connect with a pipeline owned by plaintiff PG & E for distribution within California. Finally, plaintiff Pacific Interstate was to be responsible for a second pipeline from the border between Canada and Idaho to California. In addition to crossing federal lands, these pipelines traversed large portions of state owned lands, as well as lands owned by private individuals. The connecting link between Alaskan Arctic's segment at the Canada-Alaska border, and the more southern border between Canada and the contiguous 48 states, was to have been provided by a Canadian company not a party to this lawsuit.

Prior to construction of the delivery system, each of the plaintiffs was required to file with Interior, pursuant to § 28 of the MLA, 30 U.S.C. § 185(a), an application for a right-of-way across federal lands.[4] Those applications were filed as follows: Alaskan Arctic, March 21, 1974; Northern Border, July 12, 1974; PGT and PG & E jointly, December 13, 1974; and Pacific Interstate, through its co-venturer, Interstate Transmission Associates-Arctic (ITA(A)), November 15, 1974. Not all of these applications, however, were fully acted upon, nor accepted by the President, pursuant to the Alaska Natural Gas Transportation Act (ANGTA), 15 U.S.C. § 719, *et seq.* (1976), as "best serv[ing] the national interest." *Id.* § 719e(a)(1). In the end, on September 22, 1977, the President approved an alternative to the Alaskan Arctic delivery system which alternative system was submitted by another consortium entitled Northwest/Alcan.

Because the pipeline segment, represented in the application of Alaskan Arctic, was incompatible with the Northwest/Alcan proposal, Alaskan Arctic's application, although never formally withdrawn, apparently became dormant and was labelled as "inactive." Alternatively, however, because the delivery segments represented in the applications of PGT and Northern Border *were* compatible with the Northwest/Alcan proposal, their processing was completed. The application of Pacific Interstate (ITA(A)) was withdrawn prior to the President's selection process, on March 1, 1976, in favor of ITA(A)'s use of the facilities proposed by PGT.

Notwithstanding the fact of the President's selection of Northwest/Alcan, each plaintiff's total application processing costs, as well as the cost associated with a comprehensive system-wide EIS, were as-

4. The selection process, however, of which group of pipeline companies would actually construct the pipeline, was governed by the Alaskan Natural Gas Transportation Act, 15 U.S.C. § 719, *et seq.* (1976) (ANGTA). The ANGTA also required potential pipeline manufacturers to file for certificates of public convenience and necessity with the Federal Power Commis-

sion (FPC). *Id.* § 719c. Costs were also assessed to applications for these permits as well. Plaintiffs do not contest the FPC costs assessment. The ultimate decision regarding the pipeline manufacturers to be chosen was for the President, with the advice and consent of both houses of Congress. *Id.* §§ 719e, 719f.

sessed to the Alaskan Arctic consortium. The precise scope of Interior's processing, which gave rise to the total costs which were charged to the plaintiffs, were stipulated by the parties to constitute the following:

a. Preparation of Environmental Impact Statement (EIS).

i. Portion relative to route and related facilities and activities of plaintiff Alaskan Arctic, in Alaska.

ii. Portion relative to route and related facilities and activities of plaintiff Northern Border.

iii. Portion relative to route and related facilities and activities of plaintiff ITA(A).

iv. Portion relative to route and related facilities and activities of plaintiffs PGT & P.G. & E.

v. Portion relative to route and related facilities and activities comprising EIS alternative route parallel the Trans Alaska Pipeline and Alcan Highway. On July 5, 1977 Alcan filed an application with the Department for this route.

vi. Portion relative to route and related facilities and activities proposed by El Paso Alaska Company (El Paso) to the Federal Power Commission (FPC).

vii. Portion relative to alternative routes and related facilities and activi-

ties in United States other than those listed above.

viii. Portion relative to route and related facilities and activities proposed in Canada by plaintiffs' project.

ix. Portion relative to alternative routes and related facilities and activities in Canada other than that proposed by plaintiffs' project.

x. Portion relative to alternative modes of transportation of the subject natural gas other than the El Paso alternative above.

b. Preparation of limitations to be placed upon the timing, methods, place, types and execution of activities of applicants for right of way permits, which limitations are referred to as "Stipulations" or "Permit Conditions."

i. Portion relative to route of and related facilities and activities of plaintiff Alaskan Arctic, in Alaska.

ii. Portion relative to route and related facilities and activities of plaintiff Northern Border.

iii. Portion relative to route and related facilities and activities of plaintiff ITA(A).

iv. Portion relative to route and related facilities and activities of plaintiffs PGT and P.G. & E.

Stipulation of Uncontested Facts, November 4, 1983, at 7–9. References to Alcan[5] and El Paso[6] refer to the two "competing"

---

5. "Alcan" refers to the alternative route later designated the Northwest/Alcan system. This was the system eventually approved pursuant to the ANGTA. Northwest/Alcan's proposal contained an alternative pipeline segment to that of the Alaskan Arctic segment of the Alaskan Arctic system proposal, but was otherwise consistent with those segments proposed by Northern Border, PGT and PG & E.

6. "... El Paso [an alternative, competing producer for the Alaskan pipeline project] carried on activities to attempt to secure authorization to construct a natural gas pipeline in Alaska from Prudhoe Bay to a point on the southern coast of Alaska, to transport gas which would then be liquified and transported by ship to the contiguous 48 states. The gas to be transported by the facilities proposed to the FPC by El Paso was to be the same gas as was proposed to be transported by plaintiffs pursuant to their applications to the FPC and the Department. El

Paso, on September 24, 1974, filed an application with the FPC for authorization to construct and operate the above-described facilities. El Paso never sought authorization from the Department to construct such facilities. * * *

... The Department believed that El Paso and plaintiffs would each apply simultaneously to both the FPC and the Department of the Interior. Accordingly, the FPC and Interior agreed to prepare a joint EIS for the two proposals and structure the EIS outline to maximize the direct comparison of the environmental aspects of the two projects. When El Paso failed to file with Interior, the agreement with FPC was terminated. The Department thereafter reconstructed the EIS outline to cover only the Alaskan Arctic proposal as the proposed action and reduced the analysis of the El Paso proposal to that of an alternative. The Department states that the costs incurred by the Department in connection with the anticipated El Paso application ...

gas transportation systems which were alternatives to the federal land rights-of-way sought by plaintiffs. All of said processing activities were performed over the period July 1, 1974, through September 30, 1977.[7]

The actual costs charged to the Alaskan Arctic consortium were as follows:

| Bill No. | Bill Date | Total Amount[8] |
|---|---|---|
| A 102765 | 3/13/75 | $1,540,425.85 |
| A 079537 | 5/ 7/75 | 658,728.21 |
| A 118104 | 9/ 3/75 | 919,801.41 |
| A 117108 | 10/22/75 | 241,491.30 |
| A 118109 | 3/ 1/76 | 651,781.30 |
| A 118111 | 5/13/76 | 654,097.28 |
| A 118112 | 7/30/76 | 340,678.49 |
| A 118117 | 1/11/77 | 95,690.82 |
| A 118118 | 2/ 9/77 | 44,553.93 |
| A 118119 | 6/ 7/77 | 91,892.17 |
| A 118123 | 9/12/77 | (5,945.69) |
| A 118126 | 12/ 6/77 | 14,297.55 |
| | | $5,242,492.62. |

Plaintiffs have paid bills in sequence A 102765 through A 118111, *supra*. The total of these paid bills is $4,661,325.35.[9] Bill numbers A 118112 through A 118126, *supra* ($581,167.27), have not been paid. These latter bills, adjusted by $323,947.86 for duplicative indirect costs, form the basis of the defendant's counterclaim, totalling $257,219.41.[10] In addition, defendant seeks interest on the delinquent bills in an unspecified amount. Plaintiffs assert that they requested refunds of these amounts from Interior and that those claims were denied. Defendant disputes that the aforesaid denial was ever formally issued. Defendant's Opposition Brief, December 21, 1983, p. 8.

---

were absorbed by the Department and not charged to plaintiffs. *Subsequently, the Department studied the El Paso type of proposal as an alternative under NEPA for purposes of preparing the EIS for plaintiffs' proposal and incurred substantial costs as a result, which amount is not presently known to the Department. These costs were billed to plaintiffs.*" Stipulation of Uncontested Facts, November 4, 1983, at 14–16 (emphasis added).

7. Throughout January 1975 to April 1976, Interior and the FPC held hearings and researched studies leading to the issuance of a final EIS by Interior on the Alaskan Arctic proposal on March 29, 1976.

## III. *Contentions of the Parties*

### A. *Introduction*

The contentions of the parties bifurcate the analysis, *i.e.*, whether Interior validly assessed application processing costs, into two categories. The first category includes those costs incurred *prior* to the effective date of Interior's implementing regulations authorizing fee collection, to wit June 1, 1975. The second category, not surprisingly, includes those costs incurred from and *subsequent* to June 1, 1975, or, in essence, *pursuant* to the then-effective fee collecting regulations (43 C.F.R. § 2802.1–2 (1976)).

The significance of this dichotomy is readily apparent when one considers three additional points of contention. First, plaintiffs have forcefully argued that both the IOAA and the MLA *require* valid pre-existing regulations effective as of the date of incurrance of any costs for processing a right-of-way application in order for fees to be legally assessed therefor. Second, plaintiffs have further alleged that during the period from the date the applications were filed in 1974, up to June 1, 1975, *no* fee collection regulations were in effect. Third, plaintiffs contend that subsequent to May 30, 1975, those fee regulations which were promulgated were beyond the authority of the enabling statutes, the IOAA and the MLA, and resulted in the assessment of excessive fees. The issues, thus, are squarely joined as follows: (a) were the pre-June 1, 1975 fees validly assessed given the lack of any then-effective implementing

---

8. These amounts are actually adjusted figures due to a billing correction made after Interior reduced the percentage rate plaintiffs were to be charged for indirect processing costs. *See* Stipulation of Uncontested Facts, November 4, 1983, at 10–11.

9. It is readily apparent that this figure for bills paid, $4,661,325.35 is greater than the figures listed *supra* relative to plaintiffs' requested refund, $4,053,528.42. The difference between the two figures is unexplained from the stipulation of facts.

10. *See supra* note 3.

regulations; (b) were the post-May 30, 1975 fees assessed pursuant to then-effective regulations which were themselves valid; and (c) was the assessment of post-May 30, 1975 fees, pursuant to the June 1, 1975 regulations, excessive.

## B. *Plaintiffs' Motion for Summary Judgment*

Plaintiffs request a refund of pre-June 1, 1975 incurred fees based on the contention that said fees were not collected pursuant to authorizing regulations, *i.e.*, in existence at the time the application costs were incurred, as was required by both the IOAA and the MLA. Regarding their assertion that the IOAA and the MLA only permit the assessment of application processing costs as fees pursuant to pre-existing regulations, plaintiffs rely almost exclusively on the case of *Alyeska Pipeline Service Co. v. United States*, 624 F.2d 1005, 224 Cl.Ct. 240 (1980).

In *Alyeska*, the court examined the validity of fees assessed pursuant to the IOAA and the MLA which were incurred for the processing of Alyeska's right-of-way application for the construction of a portion of the trans-Alaska *oil* pipeline. The court held that *both* the IOAA and the MLA required valid regulations to be in effect prior to Interior assessing application processing costs on rights-of-way applicants. Because no regulations existed at the time, and in addition, because the costs were incurred prior to the effective date of the MLA, the court held that the "Secretary of Interior lacked authority under applicable statutes and regulations to assess *any* part of this fee ...." (emphasis added) *Id.* at 1007, 224 Cl.Ct. 240.

As for the assessment of fees from June 1, 1975, plaintiffs attack the efficacy of Interior's cost assessment on three grounds: (a) that the *fees assessed were excessive* in that Interior charged plaintiffs "all" application processing costs when some of those costs resulted in "public" benefits for which plaintiffs are not lawfully liable; (b) that the *regulations were contrary to statutory authority* in that

they were not "fair and equitable" taking into account the value of the right-of-way to the recipient and the public benefit incurred; and (c) that the *fees assessed were excessive* in that they included charges for the analysis of "alternative" proposals not identifiable to plaintiffs, as well as included charges for two applications which were not granted. Plaintiffs' first challenge is based on the Supreme Court's decision in *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), from which they argue:

> that while fees can, of course, be charged for government services, persons such as plaintiffs, which must seek governmental authorizations, cannot be put into the position of "paying not only for benefits they received but for the protective services rendered the public by the Commission."

Plaintiffs' Reply Brief, January 18, 1984, at 9–10, *quoting National Cable*, 415 U.S. at 341, 94 S.Ct. at 1149. The precise costs-inuring public benefit, to which plaintiffs object, is that engendered in the preparation of the Alaskan Arctic environmental impact statement.

Plaintiffs also assert that because the regulations do not mandate the assessment of fees based on an allocation proportionate to the public and private benefit received, *National Cable* similarly invalidates the regulations themselves. Plaintiffs further argue that an allocation based on the public/private distinction is mandated by the language of the IOAA that fees be "fair and equitable," taking into account the "value of the recipient" and the "public ... interest served." 31 U.S.C. § 483a. Consistent with the above, plaintiffs argue that:

> *National Cable* imposes this test upon the assessment of any agency charge, regardless of whether the IOAA ... is invoked as the enabling authority. Consideration of the benefits conferred on the public or on the applicant by reason of the performance of particular services must be made on an individual, case-by-

case basis: so too with the standard "public service provided."

Plaintiffs' Reply Brief, January 18, 1984, at 13, *quoting Public Service Co. v. Watt,* unpublished slip op. (D.Colo., July 2, 1981), at 26.

Plaintiffs further assert various factors which they perceive render the charges assessed excessive, even if the regulations are valid. First, there is plaintiffs' statement that "[a] relatively small part of the land surveyed ... was public land, and most of it was outside the strip of land which Plaintiffs' hoped to use." *Id.* at 16. Second, plaintiffs point to the fact that two of the plaintiffs, Alaskan Arctic and Pacific Interstate, received no benefit by filing their applications inasmuch as those applications were not approved. Finally, plaintiffs contest the assessment of costs relative to work done by Interior for the analysis of alternatives to the proposals of plaintiffs.

Lastly, plaintiffs contend that defendant is collaterally estopped from opposing plaintiffs' entitlement based on the ruling in *Public Service Co.,* 433 F.Supp. at 144, wherein it was held that the precise regulations at issue here were held to be invalid under the standard of *National Cable.* "That decision has already been held to estop the Department from urging the validity of the regulations involved here." Plaintiffs' Reply Brief, at 11, *citing Public Service Co.,* 433 F.Supp. at 144.

## C. *Defendant's Motion for Summary Judgment*

Understandably, the thrust of defendant's motion is to establish the validity of its assessment of both pre-June 1, 1975 and post-May 30, 1975 costs. In support of its assessment of pre-June 1, 1975 costs, defendant first attempts to discredit plaintiffs' reliance on *Alyeska,* and at the same time undertakes to recharacterize that case's holding. According to defendant, *Alyeska* holds that "the 1973 amendments to the Mineral Leasing Act [*ipso facto*] made applicants liable for costs incurred after November 1973" relative to the pro-

cessing of right-of-way applications without regard to the existence of implementing regulations. Defendant's Opposition Brief, December 21, 1983, at 14. On the other hand, as for the plaintiffs' position that the MLA was not self-executing and thus requires prior effective regulations in order to legally assess those costs, defendant refers to this language as "broad ... dicta," not controlling on the facts of this case. *Id.* Defendant seeks to persuade the court that the *Alyeska* "ruling should be limited to the facts of that case...." *Id.* at 17.

Alternatively, defendant asserts that the fees incurred *prior* to June 1, 1975 could arguably be valid pursuant to a retroactive application of the June 1, 1975 regulations themselves. Relying on the fact that the MLA was passed *prior* to the date plaintiffs' applications were filed, defendant asserts that because plaintiffs "had ample notice that these regulations were forthcoming and that their applications would be subject to" the requirements of the MLA, it is neither prejudicial nor unfair to apply the MLA regulations retroactively to any fees incurred *subsequent* to the effective date of the MLA. *Id.* at 16. Defendant argues that this result is further compelled by *Public Service Co.,* 433 F.Supp. at 144, which "held that applying the cost reimbursement regulations to charges incurred before June 1, 1975, the effective date of the regulation, was reasonable, violated no concepts of due process, and was legally acceptable." Defendant's Reply Brief, February 16, 1984, at 2.

Defendant also draws support for its retroactive application of the 1975 regulations from a footnote in *Nevada Power,* as well as to another Tenth Circuit case cited therein, *Hannifin v. Morton,* 444 F.2d 200 (10th Cir.1971). In that footnote, the court states:

> [Appellant] argues that even if upheld, the regulations (June 1, 1975) may not be applied retroactively to recover costs incurred prior to their promulgation. We find this argument to be meritless. This precise question was considered and de-

termined by this court in *Hannifin v. Morton.*

*Nevada Power,* 711 F.2d at 933 n. 19 (citations omitted). Defendant asserts that the authority of *Hannifin* requires a ruling that plaintiffs never acquired any "vested right" to have their applications completed on the basis of the regulatory structure in effect on the date the applications were filed. Defendant's Opposition Brief, at 20.

On the merits of plaintiffs' challenge to the validity of the June 1, 1975 regulations, defendant contends that its regulations do not ignore the "value to recipient" standard or the public/private benefit distinction as alleged by plaintiffs. Without directly confronting plaintiffs' argument relative to the "value to recipient" standard, defendant attempts to distinguish the case on which plaintiffs rely for their interpretation of this phrase, *National Cable Television Ass'n v. FCC,* 554 F.2d 1094, 1107 (D.C.Cir.1976). According to defendant, "[t]hat case did not involve EIS costs, however, but fees charged for granting communications licenses." Defendant's Opposition Brief at 10. Unfortunately, defendant fails to reveal the substantive importance of this distinction.

Regarding the public/private benefit dichotomy, defendant directly disputes the applicability of any such cost allocation requirement to the assessment of fees for statutorily required environmental impact statements. Defendant cites the case of *Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Commission,* 601 F.2d 223 (5th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980), for the proposition that *National Cable* only requires that EIS costs be assessed to identifiable beneficiaries, not apportioned based on "the incidental public benefits flowing from the provision of that service." Defendant's Opposition Brief at 10, citing *Mississippi Power,* 601 F.2d at 230. Defendant likewise rejects plaintiffs' attempt to apply *Nevada Power,* stating that plaintiffs "miscite *Nevada Power* for the general proposition that an apportionment of the costs of preparing an EIS is required based upon the ratio of private to public benefits." *Id.* at 11.

Defendant similarly disputes plaintiffs' assertion that its assessment of EIS costs was excessive. Defendant argues here that, in incurring costs, it only undertook those activities required by the National Environmental Policy Act (NEPA), which activities were neither discretionary nor beyond the broad scope of the NEPA as interpreted by the courts. *See Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976); *City of Rochester v. U.S. Postal Service,* 541 F.2d 967 (2d Cir.1976). Defendant justifies its assessment of alleged high costs and those costs associated with alternative proposals arguing that the entire analysis undertaken was for one project, "related either geographically or as logical points in a chain of contemplated actions...." Defendant's Opposition Brief, at 13, *quoting Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 481 F.2d 1079, 1087 (D.C.Cir.1973), *quoting* Council on Environmental Quality, Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements (May 16, 1972).

Supportive of its position, defendant has noticed the court by motion, pursuant to RUSCC 5(d), of the June 26, 1985 decision of the Federal Circuit in *Sohio Transportation Co. v. United States,* 766 F.2d 499 (Fed.Cir.1985). That case considered, *inter alia,* the validity of the regulations at issue in this case (43 C.F.R. § 2802.1–2 (1976)) under the authority of the IOAA and MLA. There, the court found the regulations to be valid and effective against challenges based on the "fair and equitable" and "value to the recipient" standards similarly asserted by the plaintiffs here. Plaintiffs have attempted to distinguish the applicability of *Sohio* to the case at bar by arguing that in *Sohio,* as contrasted to the case at bar, Sohio had previously agreed in writing to pay its right-of-way application processing costs; Sohio had paid its fees without protest; the Sohio application was filed after regulations were promulgated; the majority of Sohio's right-of-way application

involved federal lands; and three of the four plaintiffs here, in contrast to Sohio, were never issued right-of-way permits. Plaintiffs' Response to Defendant's July 3, 1985 "Motion To Call Attention Of Court To Recent Decision," July 19, 1985, at 2.

Finally, defendant contests plaintiffs' assertion that it is collaterally estopped by the decision in *Public Service Co.,* 433 F.Supp. at 144, from relitigating the validity of the June 1, 1975 regulations, 43 C.F.R. § 2802.1-2 (1976). Defendant argues that by the recent authority of *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), the applicability of non-mutual offensive collateral estoppel has been expressly rejected by the Supreme Court for cases where the United States is the defendant. Alternatively, defendant argues that even were non-mutual collateral estoppel available to plaintiffs, "estoppel would not lie because the issues [in *Public Service* and the case at bar] were not the same." Defendant's Reply Brief, at 5.

## IV. *Discussion*

The three main issues presented by the parties' cross-motions for summary judgment regarding liability, as stated *supra,* are: (a) whether those fees assessed relative to costs incurred prior to June 1, 1975 were valid given the lack of any then-effective regulations; (b) whether the June 1, 1975 regulations, pursuant to which the balance of the plaintiffs' fees were assessed, exceeded the authority of the Secretary; and (c) whether the June 1, 1975 regulations, as applied to plaintiffs, resulted in the assessment of excessive fees. We believe, as discussed in more detail *infra,* that (1) regarding the pre-June 1, 1975 incurred costs, *Alyeska* constrains us to invalidate those fees assessed for said costs pursuant to the IOAA as well as the MLA due to the absence of any cost recovery regulations in effect at the time said costs were incurred; (2) regarding the June 1, 1975 regulations themselves, *Sohio* equally constrains us to conclude that said regulations were within the authority of

the Secretary pursuant to both the IOAA and the MLA; and (3) regarding whether the post-May 30, 1975 fees were excessive, we believe that because Interior was authorized to assess fees for its *full* costs, and that such costs as were incurred were entirely consistent with the NEPA, the fees assessed for costs incurred from and after June 1, 1975 were not excessive.

### A. *The Pre-June 1, 1975 Fees*

The *factual* basis of plaintiffs' claim, that at the time the pre-June 1, 1975 costs were incurred no cost recovery regulations had been promulgated pursuant to the authority of either the IOAA or the MLA, is indisputable. What is in controversy is the *legal* question of whether either the IOAA or the MLA or both required the promulgation of implementing regulations, effective at the date the costs were incurred, in order for fees for those costs to be validly assessed against applicants. Stated differently, the question is whether the June 1, 1975 regulations simply may be applied retroactively to validate costs incurred prior to said implementing date. It is on the resolution of this latter question that the validity of Interior's recovery of pre-June 1, 1975 costs must turn.

#### 1. *The IOAA*

The answer to the issue posed above relative to the IOAA is one over which little controversy can extend. In fact, defendant has not affirmatively contended that the IOAA does not require implementing cost recovery regulations in order for that statute to form the basis of the Secretary's authority for the assessment of plaintiffs' application costs. Quite clearly, § 483a of Title 31, United States Code, provides that cost recovery authority is available to the Secretary only when that authority is exercised pursuant to authorizing regulations:

It is the sense of Congress that any ... license, permit, ... or similar thing of value or utility ... provided, granted, ... or issued by any Federal agency ... to or for any person ... shall be self-sustaining to the full extent possible, *and*

*the head of each Federal agency is authorized by regulation ... to prescribe therefor such fee, charge, or price ... as he shall determine....* (emphasis added).

█ In the case at bar, that the IOAA mandated pre-existing regulations is, as we see it, indisputable. Plaintiffs here in 1974 sought a "license" or "permit," issued by a "Federal agency," for which the IOAA required that they reimburse Interior for costs incurred. Said reimbursement would have been appropriate, however, in the words of the statute, only if it had been "authorized by regulation." As no implementing regulations were in existence prior to June 1, 1975, any costs incurred prior to that date could not have been legally assessed premised on authority derived from the IOAA. This is so because the general rule as provided in the IOAA is that "the government may obtain reimbursement of its expenses in issuing licenses or permits *only pursuant to authorizing regulations* " (emphasis added). In short, we read the IOAA to entitle the agency to reimbursement subject to a condition precedent, and that condition is that authorizing regulations *must first* be promulgated. *See Alyeska*, 624 F.2d at 1009–1010; *Nevada Power*, 711 F.2d at 913.

### 2. *The MLA*

█ In contrast to the settled interpretation of the IOAA *supra*, the precise question of whether the MLA, standing alone, authorized pre-June 1, 1975 cost recovery in this case is somewhat more complex. We feel, however, that sufficient obligatory authority exists in *Alyeska* to resolve this question in the negative. We interpret *Alyeska* to hold that Congress similarly intended, as with the IOAA, that cost recovery pursuant to the MLA was only authorized if it was undertaken pursuant to existing regulations. That is to say, relative to pre-June 1, 1975 costs, the regulations had to have been *in effect* at the time the costs in question were actually *incurred*. Stated differently, belated regulations, once effective, could not be applied retroactively to recover costs actually in-

curred before said regulations were promulgated and made effective. In interpreting *Alyeska* accordingly, we also apply these rules to bar recovery of pre-June 1, 1975 incurred costs through fees assessed against plaintiffs under the MLA.

In *Alyeska*, the court considered the following provision(s) of the MLA:

> *The applicant for a right-of-way or permit shall reimburse the United States for administrative and other costs incurred in processing the application,* and the holder of a right-of-way or permit shall reimburse the United States for the costs incurred in monitoring the construction, operation, maintenance, and termination of any pipeline and related facilities on such right-of-way or permit area and shall pay annually in advance the fair market rental value of the right-of-way or permit, *as determined by the Secretary or agency head.*

30 U.S.C. § 185(*l*) (1976) (emphasis added). *Alyeska* involved a challenge to incurred cost related fees, substantially identical to that made here by plaintiffs, in which it argued for a refund of right-of-way application processing costs. There the government alleged that the MLA (November 1973) (which was not in existence at the incurrence of the costs (September 1973)) was effective retroactively. Alyeska similarly alleged the invalidity of the assessed fees under the MLA (which was in existence when the costs were incurred here) because Interior failed to act pursuant to existing cost recovery regulations as required by statute.

The government contended in *Alyeska* that the MLA provides ample authority for implementing the cost recovery undertaken regardless of the fact that the Secretary did not act pursuant to pre-existing regulations. Analogizing to the clear regulatory mandate made with regard to the IOAA, the *Alyeska* court observed, in response to the foregoing position of the defendant, that:

> Section 185(*l*) [*i.e.* the MLA] does not override the requirement of the Indepen-

dent Offices Appropriation Act that reimbursement of expenses be "authorized by regulation." Section 185(*l*) merely obligates an applicant for a right of way or permit to reimburse the United States for its expenses of processing the application.... [*It does not*] *indicate that in enacting section 185(l) Congress intended to eliminate* for right-of-way and permit applications generally, or for the trans-Alaska pipeline in particular, *the regulation requirement in the Independent Offices Appropriation Act.*

*Alyeska,* 624 F.2d at 1011 (emphasis added). The court went on to find this view entirely consistent with its extensive review of the MLA's legislative history. *See id.* at 1011–13.

The court in *Alyeska* also found Interior's assessment of fees pursuant to the MLA to be defective for another reason. Because the application related costs contracted by defendant were incurred *prior* to the effective date of the MLA (November 1973), to ground the efficacy of said cost recovery upon the MLA would be to apply that statute *retroactively* to costs incurred approximately three years prior to the statute's effective date. Recognizing that such an interpretation is to be avoided absent specific "words in the statute [which] 'are so clear, strong, and imperative, that no other meaning can be annexed to them ...,' " the court declined to find that the MLA could be retroactively applied to authorize the assessment of costs incurred prior to its effective date. *Alyeska,* 624 F.2d at 1013, *quoting United States v. Heth,* 3 Cranch 399, 7 U.S. 399, 413, 2 L.Ed. 479 (1806). In so concluding, the court reiterated that " 'the first rule of construction [is] that legislation must be considered as addressed to the future, not the past,' " *Alyeska,* 624 F.2d at 1013, *quoting Union Pacific Railroad Co. v. Laramie Stock Yards Co.,* 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed.2d 179 (1913) (citations omitted), and that the governing rule is that " 'Congress is presumed to have intended statutes ... to operate prospectively unless there is clear expression or legislative history to the contrary.' " *Id.* 624 F.2d at

1013, *quoting Sea-Land Service, Inc. v. United States,* 493 F.2d 1357, 1369, 204 Cl.Ct. 57, *cert. denied,* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974).

Regarding our conclusion that the MLA authorizes cost recovery against applicants for a right-of-way *only* pursuant to pre-existing regulations, it is plain that that issue was squarely addressed by the court in *Alyeska.* From the quotations above, it is clear that the court in *Alyeska* adopted this conclusion as one of two substantive bases for its rejection of Interior's fee assessment. Defendant's assertion that this conclusion by the court in *Alyeska* was merely "broad ... dicta" is without merit. Under the authority of *Alyeska,* therefore, given plaintiffs' substantive challenge to Interior's cost recovery is identical in all material particulars to that in *Alyeska,* we are compelled to similarly invalidate Interior's recovery of pre-June 1, 1975 incurred costs assessed as fees against the plaintiffs in the case at bar. Defendant was required to act pursuant to pre-existing, then-effective regulations if it wished to legally assess pre-June 1, 1975 incurred costs under the authority of either the MLA or the IOAA. We find that it failed to do so.

Defendant has also argued, as noted *supra,* that the assessment of fees for pre-June 1, 1975 costs was equally justifiable based on a retroactive application of the June 1, 1975 regulations themselves. While *Alyeska* dealt expressly with the retroactive application of the MLA *statute,* we believe implicit in that decision was a rejection, *sub silentio,* of the retroactive application of any regulations promulgated pursuant to either the IOAA or MLA as well. We reach this conclusion based on the court's analysis of the IOAA, which statute *was,* in contrast to the MLA, in effect at the time Alyeska's application processing costs were incurred. If, as defendant has argued, an effective *statute* provided sufficient authority to apply the 1975 regulations retroactively, then the existing authority of the IOAA would have been a clear basis for the court to have looked to sustain Interior's retroactive assessment.

The court in *Alyeska*, however, when confronted with a fee authorizing statute *in effect* at the time the disputed costs were incurred, but *without* fee authorizing regulations effective before said costs were incurred, declined to affirm Interior's application of those regulations on a retroactive basis.[11] We find the *Alyeska* court's tacit rejection of the retroactivity principle ample authority for a rejection of Interior's retroactive cost assessment in the case at bar.[12]

■ In addition, we also believe that to follow *Alyeska* precisely is to adopt the conclusion that the same considerations governing the retroactive application of statutes should be applied to decide when regulations promulgated pursuant to those statutes should be likewise retroactively applied. The substance of this conclusion is the often overlooked fact that administrative agencies do not themselves, in effect, make the law of the land. *Dixon v. United States*, 381 U.S. 68, 74–75, 85 S.Ct. 1301, 1305–1306, 14 L.Ed.2d 223 (1965); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). They act pursuant to a Congressional mandate, which, although "delegated," carries with it, by necessity, the imprint of Congressional intent. *Ernst & Ernst*, 425 U.S. at 214, 96 S.Ct. at 1391. In substance, it makes no sense to apply and interpret administrative regulations in a manner inconsistent with the way one interprets the very statute from which the authority for those regulations is itself derived. In the context of this case, therefore, we believe that unless the Congress specifically mandated, in words that "are so clear, strong, and imperative," that cost recovery pursuant to regulations promulgated under the MLA be made retroactive, it is beyond the authority of this court to so enforce them.[13]

The language of the MLA relied on by defendant as authority for its assessment of fees relative to pre-June 1, 1975 costs reveals nothing regarding whether Congress intended cost recovery prior to the date fee-authorizing regulations were enacted. In fact, given the mandate that costs be assessed *only* pursuant to authorizing regulations, it would perhaps be inconsistent for Congress to have intended any *liability* for costs to have been established prior to the date an *assessment* of fees for those costs could actually have been enforced. Moreover, our review of the relevant legislative history discloses lit-

---

**11.** We also note that while we have stated such a reading of *Alyeska* to be "implied," a footnote in that case is actually quite on point. Footnote five states, in reference to the regulations at issue here: "The current regulation probably would permit the assessment of all of the fees at issue here, but does not apply to pre-promulgation costs. 43 C.F.R. § 2802.1–2 (1979)." *Alyeska*, 624 F.2d at 1010 n. 5.

**12.** Defendant attempts to explain the *Alyeska* court's failure to adopt the IOAA as a basis to validate Interior's retroactive cost assessment by the fact that in *Alyeska*, the plaintiffs' right-of-way application was not pending on the effective date of the 1975 regulations. By contrast, defendant argues, plaintiffs' applications here were pending on the effective date of the 1975 regulations. We do not believe that defendant's distinction would *in any way* have precluded the court's validation of the pre-June 1, 1975 cost recovery had valid regulations been in effect at the time those costs were incurred. This view is persuasively supported through a statement in *Alyeska* which refers to pre-June 1, 1975 cost recovery authority under the IOAA:

> The statute [IOAA] therefore *would have* authorized the Secretary to impose a fair and equitable "fee, charge or price" "therefor" *if he had* "authorized [such assessment] by regulation."

*Alyeska*, 624 F.2d at 1010 (emphasis added). We believe the *singular* conditionality of the court's statement, in reference to the precise facts in *Alyeska*, belies defendant's assertion that in addition to the existence of regulations, there were other factors, such as whether the application was still pending, to consider before the *Alyeska* court could have validated the fees assessed.

**13.** Indeed, it is clear beyond cavil that Congress would have known, at the time the MLA was passed, that the promulgation of regulations potentially takes substantial time. Were there sufficient concern about this potential lag .in the overall cost recovery scheme, we believe Congress would have so stated in the MLA or its legislative history. Because Congress did not do so similarly argues for a purely prospective application of the MLA *and* its implementing regulations.

tle, if anything of substance, by way of "clear, strong, and imperative" language indicating that Congress intended liability to exist for application processing costs, which costs were then to be assessed retroactively *after* the date Interior would get around to promulgating fee-authorizing regulations.[14] In short, we find that the presumption of prospective application has not been refuted by any statutory interpretation defendant has asserted on the record.

Nevertheless, defendant attempts to buttress its position relative to the retroactivity of the June 1, 1975 regulations by arguing that that retroactivity is justified because plaintiffs "had ample notice that these regulations were forthcoming and that their applications would be subject to [them]." Defendant's Opposition Brief, at 16. The concept that notice cures all, or is the primary consideration, is not persuasive. While some language to that effect appears in the analogous fee refund case of *Public Service Co.*, 433 F.Supp. at 144, we note that the district court in that case itself disavowed its reliance on such notions in reaching its final disposition. More importantly, because plaintiffs' applications were pending on the date the regulations went into effect, their options to react to any unfavorable regulatory changes were necessarily limited—regardless of whether they had notice.

While an argument based on notice was suggested by the court in *Andrus*, we reject the notion that plaintiffs would not have been significantly prejudiced by simply withdrawing their applications if they did not like the new *ex post facto* regula-

tory scheme. In light of the investment plaintiffs had *already* made in the furtherance of their applications, at the *time* the new regulations went into effect, any retroactive application of said regulations would raise serious questions of fundamental fairness. We view these concerns as particularly relevant given the broad scope of reform which was ushered in by the June 1, 1975 regulations.

■ In addition to the foregoing, defendant relies vigorously for its retroactivity argument on two other cases, *Nevada Power*, 711 F.2d at 913, 933, and *Hannifin v. Morton*, 444 F.2d 200 (10th Cir.1971). As detailed more fully *supra*, *Nevada Power* cryptically acknowledges the validity of a retroactive application of the June 1, 1975 regulations in a footnote. *Nevada Power*, 711 F.2d at 933 n. 19. That footnote is also the source of the *Hannifin* citation. We note preliminarily that neither of these Tenth Circuit cases is in any way binding on this court. There is, however, a better reason for not blindly accepting the government's reliance on the *Nevada Power* footnote.

In *Hannifin*, the language of the statute which was used to justify the retroactive application was the prescription for the Secretary to construct a new fee schedule for the per acre rental of sulphur lands in accordance with "such rules and regulations as he may prescribe." *Hannifin*, 444 F.2d at 202. Quite simply, there is no such statutory provision in the case at bar. As the thrust of *Hannifin*'s analysis of retroactivity turned upon the reasonableness of such an approach *based on the general*

---

14. The only reference in the legislative history which even remotely implies that Congress intended to seek recovery of costs irrespective of any retroactive application relates to the application of the MLA and is ably discussed in the *Alyeska* decision as follows:

> The only item in the entire legislative history that provides any support for the government's position—and the only item which it cites—is the following statement in the debate on the conference report by Senator Jackson, the Senate manager of the bill: "In the case of the trans-Alaska pipeline permit it is anticipated that the Government will be reimbursed

for all money that has been, or will be appropriated and spent as a line item under this subject." 119 Cong.Rec. 36814 (1973). This statement immediately followed Senator Jackson's statement, quoted at page 1013, *supra*, that fees assessed under section 185(*l*) would be pursuant to regulations.

> *This single statement falls far short of establishing that Congress intended to make Alyeska liable for the more than $12 million the United States already had expended in connection with the pipeline.*

*Alyeska*, 624 F.2d at 1016 (emphasis added).

*authority of the clause cited supra,* without such a clause in the case at bar, the value of *Hannifin* in resolving the retroactivity issue in this case is highly suspect.

In addition, we also note that the issue of retroactive *cost* recovery was *not* involved in the *Hannifin* case. That case dealt with the assessment of a *one-time* acreage *fee* which was not cost based like the charges in issue here. In essence, the retroactive effect of the regulations in *Hannifin,* based on fees which were not in dispute regarding their allocability to a particular time frame of incurrence, cannot govern the result which is to obtain where the precise issue *is* the recovery of costs specifically identifiable by particular time frames of incurrence. In sum, the summary disposition from the footnote in *Nevada Power,* given its absolute reliance on the *Hannifin* case, lends little support to defendant's retroactivity argument.

In substance, our reading of *Alyeska* conforms more closely with the position proffered by the plaintiffs relative to the invalidity of Interior's assessment of fees for those costs incurred prior to June 1, 1975. This is so because we believe Congress intended that for either the IOAA or the MLA to be the basis of the Secretary's cost recovery authority relative to right-of-way applications, that authority could *only* be exercised pursuant to the existence of implementing regulations in effect at the time the costs in issue were incurred. Inasmuch as it is undisputed that there were no such regulations in effect *prior* to June 1, 1975, we find that those fees assessed relative to costs incurred *prior* to June 1, 1975 were invalid under both the IOAA and the MLA.

## B. *The Post-June 1, 1975 Fees*
### 1. *Validity of the 1975 Regulations*

■ We next address, in our threshold focus, the validity of the June 1, 1975 fee authorizing regulations which calls into question the legality of the fees assessed against plaintiffs relative to costs incurred by defendant from and after June 1, 1975. With regard to the foregoing issue, we find that we are bound by the affirmative decision of the Federal Circuit in the case of *Sohio,* 766 F.2d at 499. In *Sohio,* the plaintiffs, also applicants for rights-of-way across federal lands, challenged the *identical* 1975 regulations involved here as beyond the authority of the Secretary of Interior under the IOAA and the MLA. In that case, the court considered similar challenges related to the "fair and equitable" and "value to the recipient" standards of the IOAA, as well as examined the lower court's analysis of the public/private standard required by the Supreme Court's decision in *National Cable.* The court there unhesitatingly concluded that:

> we hold that the Secretary has not exceeded his authority under the IOAA and MLA in promulgating the right-of-way reimbursement regulations here at issue....

*Sohio,* 766 F.2d at 504–05. Given the foregoing, we are constrained to similarly reject the instant plaintiffs' facial challenge to the validity of the 1975 regulations themselves.

### 2. *Validity of the 1975 Regulations As Applied To Plaintiffs*

Regarding plaintiffs' alternative theory, that the 1975 regulations were invalid, as applied to them, in that the application thereof resulted in the assessment of excessive fees, the *Sohio* decision provides some basis for an answer, but does not directly resolve what it calls the "shadow" issue.[15] Thus, the substance of plaintiffs' challenge remains regarding the full cost standard, as to whether the precise in-

---

**15.** *Sohio,* 766 F.2d at 501. In *Sohio,* the court makes this clear by stating, "the reasonableness of the EIS charge [is] not the matter appealed to this court." *Id.* Nevertheless, *Sohio* appears to sanction Interior's assessment of the *full* costs of processing plaintiffs' right-of-way applications under the authority of the 1975 regula-

tions. While the holding in *Sohio* does not reflect such a conclusion in express terms, the court there cites with approval extensive language so holding from the Tenth Circuit decision in *Nevada Power. See Sohio,* 766 F.2d at 503–04.

curred costs charged as fees were excessive. In other words, while the language of the 1975 regulations is valid under the IOAA and the MLA, Interior's interpretation and application of the 1975 regulations (as perceived by plaintiffs) presents an entirely different question.

■ In specific terms, as detailed *supra,* plaintiffs complain about—the high amount of their fees considering the minimal distance their rights-of-way would cross federal lands relative to the entire pipeline project; the fact that two plaintiffs' applications were never approved; and that plaintiffs were charged for the analysis of several alternative proposals. In judging whether said costs were excessive or beyond the full cost standard, the scope of our review is limited. Only two criteria are of particular concern: (1) whether an assessment of the full costs for those precise activities listed *supra* is consistent with the standards laid down by the Supreme Court in *National Cable;* and (2) whether said costs were reasonably contemplated by certain provisions in the NEPA.[16] We believe that inasmuch as the NEPA governs the scope of Interior's EIS analysis, to the extent Interior acted within the guidelines of the NEPA, and consistent with the standard of *National Cable,* any costs incurred thereunder must be said to have been valid and reasonable.

Most recently, the D.C. Circuit interpreted the *National Cable* public/private benefits doctrine to limit fee assessments by the application of three constraints:

First, the fee may not exceed the agency's cost of providing the service. Second, the fee must be reasonably related to and may not exceed the value of the service to the recipient, whatever the agency's costs may be. Finally, when the specific agency activity in question produces an *independent* public benefit, the agency must reduce the fee that it would otherwise charge by that portion of the agency's costs attributable to that public benefit. (citations omitted).

*Central & Southern Motor Freight Tariff Ass'n v. United States,* 777 F.2d 722, 729 (D.C.Cir.1985). *Accord, Mississippi Power & Light,* 601 F.2d at 230. Applying these standards to the precise fees contested by plaintiffs, we are not persuaded that Interior interpreted its regulations so as to run afoul of the public/private benefits distinction as outlined by the *National Cable* doctrine.

Relative to Interior's actual costs, there is presented no allegation that the amount of the total fee charged exceeded in any way Interior's *actual* cost of preparing the EIS. As to all challenges, the first criteria above is clearly met.

The second criteria, the relationship of the challenged fees to the value of the right-of-way to the recipient, is also undeniably met. While plaintiffs seek to direct the court's attention primarily to the minimal distance sought for a pipeline right-of-way over federal land relative to those EIS costs incurred for a study of the *total* pipeline, the more central comparison is the total EIS cost versus the value of plaintiffs' pipeline. From this perspective, it cannot be disputed that plaintiffs' rights-of-way, regardless of the length thereof over federal land, represent long-term benefits worth many times the few millions of dollars charged for the EIS. Assuming Interior was required to study the entire pipeline, as well as to analyze alternatives, *as prerequisites to granting rights-of-way* (as discussed *infra* ), we believe the unique and *essential* benefits those rights-of-way conferred on plaintiffs were not economically disproportionate to the fees charged.

Relative to those applications not approved, the value received by applicants in comparison to the fees assessed is still clearly within the bounds of reason. In this regard, it is worth noting preliminarily that charges for the EIS are for a single, combined proposal. In addition, at the time

**16.** *See Swain,* 542 F.2d at 369 (7th Cir.1976) ("The task of the court is not to decide where to draw the line, but to review the matter to ascertain whether the agency has made a reasonable choice.").

the EIS was contemplated, all plaintiffs' applications were then active. More importantly, the charges themselves were allocated to plaintiffs to the extent their applications *were* active. Therefore, it is simply inconsistent to argue, as plaintiffs do, that *value* to the withdrawn applications should be measured after the fact—after the applications became inactive—when the costs were incurred, and the fees were contemplated, *at a time when all applications were active.* From this perspective, under the reasoning articulated *supra, at the time the EIS costs were incurred,* the fees assessed were proportionate to the economic value of the rights-of-way plaintiffs fully expected to receive *at that time. See New England Power Co. v. NRC,* 683 F.2d 12, 14 (1st Cir.1982) ("That the utility subsequently withdraws its application does not defeat the fact that it has already received a benefit by virtue of the work already done at its request.").

As for the final criteria, the *independent* public benefit test relative to EIS costs, *Mississippi Power* is directly on point. The following passage is of particular relevance:

> [T]he petitioners question the authority of the NRC to charge for the costs incurred in conducting environmental reviews required by the ... (NEPA) [citation omitted]. We uphold the Commission's authority to charge a fee for such reviews because they are a prerequisite to the issuance of a license. It matters not that the legal obligation of preparing [an EIS] ... rests with the NRC; *nor is the Commission's authority to assess such fees undercut by the obvious public benefit flowing from the preparation of these environmental reviews. Because the Commission may recoup the full cost of conferring a special benefit, it may recover its costs for conducting environmental reviews.*

*Mississippi Power,* 601 F.2d at 231 (footnotes omitted). In essence, we believe *Mississippi Power* stands for the proposition that the existence of an identifiable private benefit, such as a right-of-way, validates the assessment of the *full costs* therefor,

"regardless of the incidental public benefits flowing from the provision of that service." *Id.* at 230. That the preparation of an EIS is a prerequisite to the issuance of a federal right-of-way, a valuable license plaintiffs voluntarily sought, precludes an inconsistent finding that those same EIS costs could also possess an *independent* public benefit. In other words, the independent public benefits test means exactly what it says, *i.e.,* only those fees assessed for costs which support activities with *exclusive* and *unconditional* public benefits are invalid. Clearly, the rights-of-way sought here by plaintiffs, which required the issuance of an EIS, did not represent exclusive and unconditional public benefits.

That the EIS costs, challenged by plaintiffs, comply with the three-pronged *National Cable* public/private benefits analysis, however, is not the final step. As stated *supra,* said costs would be equally excessive if they were not reasonably required by the provisions of the NEPA. Those circuit courts interpreting the requirements of the NEPA, generally hold that an EIS "must ... take a pragmatic and realistic view of the scope of the action being contemplated." *Swain,* 542 F.2d at 369. *See also Scientists' Institute for Public Information,* 481 F.2d at 1092. "But implicit in this rule of reason is the overriding statutory duty of compliance with impact statement procedures to 'the fullest extent possible.'" *Id.*

The governing language of the NEPA, pursuant to which plaintiffs' EISs were prepared, is § 4332 of Title 42, United States Code. That section provides for inclusion in:

> every recommendation or report on ... major Federal actions significantly affecting the ... environment, a detailed statement by the responsible official on—
>
> > (i) the environmental impact of the proposed action,
> >
> > (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

According to the Supreme Court, this section "requires all agencies of the United States, 'to the fullest extent possible,' to 'include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment' an environmental impact statement analyzing the consequences of, and alternatives to, the proposed action." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 785, 96 S.Ct. 2430, 2437, 49 L.Ed.2d 205 (1976). Such reviews "are a prerequisite to the issuance of a [right-of-way] license." *Mississippi Power*, 601 F.2d at 231.

Regarding plaintiffs' first charge, that based on the proportion of federal lands crossed by the pipeline relative to the scope of the EIS studying the entire pipeline system, we note that the language of the NEPA does not itself appear to provide a *precise* answer. The issue of scope, however, has been debated on numerous occasions in the closely analogous context of inter-state and intra-state highway construction. *See Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d 637 (2d Cir.1976); *Daly v. Volpe*, 514 F.2d 1106 (9th Cir.1975); *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971). "The courts which have faced this problem—determining the scope of the proposed highway project—have looked for certain key attributes...." *Swain*, 542 F.2d at 369. In particular, two criteria have been adopted, which we find adaptable to assessing the proper scope of the EIS in the case at bar. These are (1) whether the pipeline segments crossing federal lands, which plaintiffs assert *should* have determined the scope of the EIS, had a definable "independent utility" on their own; and (2) whether those same segments possess "logical termini" and foreclose any "avenues for expansion." *Id.*

The precise assertion we seek to measure by these two criteria is plaintiffs' complaint that the scope of their EIS should have been tailored more closely to the distance their pipeline crossed *federal* land only, as opposed to the actual EIS undertaken which studied the entire pipeline system crossing in many states, Canada, and miles of private lands. Like many of the highways discussed in the cases cited above, it takes little analysis to reach the conclusion that the unique and primary selling point of plaintiffs' pipeline proposal was the fact it spanned the *entire* distance from Alaska to valuable connecting distribution points in the contiguous 48 states. In fact, this overall integrated quality of the trans-Alaska/Canada/United States gas pipeline is essentially the goal Congress declared in authorizing the pipeline:

Congress finds and declares that—

... the expeditious construction of a viable natural gas transportation system for delivery of Alaska natural gas to United States markets is in the national interest....

15 U.S.C. § 719(3) (1976). That *one system* spanning the entire distance was contemplated by Congress is clear. Taken as a whole, we believe Interior acted well within the confines of reason in assessing the environmental impact incurred costs of plaintiffs' proposal on a system-wide basis. That the EIS studied the whole system, where only random federal rights-of-way were sought, does not persuade us otherwise.

Regarding plaintiffs' other challenge to the scope of the EIS, relating to alleged excessive charges for the analysis of alternative proposals, we are similarly not persuaded. In simple terms, the NEPA specifically provides for such analysis where it states:

a detailed statement by the responsible official [shall be undertaken] on—

....

(iii) alternatives to the proposed action, ....

42 U.S.C. § 4332 (1982). Plaintiffs neither address this language, nor attempt to avoid its effect. We believe the NEPA clearly sanctioned Interior's analysis of alternative proposals as a *pre-requisite* to issuing the rights-of-way sought by *plaintiffs*.

Having passed the criteria of both *National Cable* and the NEPA, we find Interior's assessment of the full costs of plaintiffs' EIS to have been reasonable, *not* excessive, and in full conformity with law.[17]

## V. *Conclusion*

To restate, we hold today that Interior's assessment of fees for costs incurred *prior* to June 1, 1975 was invalid due to the lack of fee authorizing regulations in effect at the time those costs were incurred. We also hold that the 1975 fee authorizing regulations, 43 C.F.R. § 2802.1–2 (1976), are facially valid under the authority of the IOAA and MLA, and that as applied to recover costs incurred from and after June 1, 1975, they did not result in the imposition of excessive fees.[18] Therefore, plaintiffs' motion is granted in part and denied in part; and concomitantly defendant's motion is granted in part and denied in part.

The issue of the precise amount of damages, consistent with this opinion, is remanded for a mathematical determination by the U.S. Department of Interior, Bureau of Land Management (BLM), to return as the basis for the parties' stipulation, if agreeable, as to the amount of damages within sixty (60) days of this opinion. RUSCC 60.1. To the extent the parties cannot stipulate to the amount of damages upon the receipt of the mathematical calculations of the BLM, a further order will be issued by the court directing the parties as to how they shall proceed. No costs shall as yet be awarded.

IT IS SO ORDERED.

---

**17.** As for plaintiffs' collateral estoppel argument based on *Public Service Co.*, 433 F.Supp. at 144, we reject said contention based on the identical principles outlined by Judge Yock in *Sohio Transp. Co. v. United States*, 5 Cl.Ct. 620, 637–38 (1984), *aff'd*, 766 F.2d 499 (Fed.Cir.1985). We believe, as stated by Judge Yock, that "[t]he application of nonmutual offensive collateral estoppel against the Government 'would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.'" *Sohio*, 5 Cl.Ct. at 637, *quoting*, *United States v.*

*Mendoza*, 464 U.S. 154, 160, 104 S.Ct. 568, 572, 78 L.Ed.2d 379 (1984).

**18.** The Stipulation of Uncontested Facts, at para. 16, establishes that unpaid assessed costs total $257,219.41 plus interest. This holding, of course, finds that to the extent defendant's counterclaim asserts a right to the payment of unpaid costs incurred *from and after* June 1, 1975, said counterclaim is hereby granted. On the other hand, to the extent said counterclaim seeks reimbursement for unpaid costs incurred *prior* to June 1, 1975, it is denied.